COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Raphael and Senior Judge Petty
Argued at Richmond, Virginia


LARRY D. GREENE, S/K/A
  LARRY DEMETRIC GREENE

                                                            MEMORANDUM OPINION[*] BY
v.      Record No. 1578-22-2                            JUDGE WILLIAM G. PETTY
                                                                 APRIL 9, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ORANGE COUNTY
John R. Cullen, Judge Designate

(Richard T. Harry, Jr., on brief), for appellant.  Appellant submitting
on brief.

Angelique Rogers, Assistant Attorney General (Jason S. Miyares,
Attorney General; Leanna C. Minix, Assistant Attorney General, on
brief), for appellee.


        Larry Demetric Greene appeals his conviction, following a bench trial, for arson in violation

of Code § 18.2-77.[1]  Greene asserts that the trial court abused its discretion when it excluded the

testimony of a proposed defense witness and a photograph he sought to admit.  He further argues

that the evidence was insufficient to support his conviction because he did not cause burning of the

dwelling.  For the following reasons, we disagree and affirm the conviction.

## BACKGROUND

        On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Greene was also convicted of threatening to damage a building, in violation of Code
§ 18.2-83.  On appeal, Greene only challenges the sufficiency of the evidence to support his
arson conviction.

*Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

So viewed, the evidence established that Olivia Knight and Greene were romantically involved at one time. In November 2019, however, their relationship had ended. On November 25, 2019, Knight lived with her daughter, her mother, her aunt, and her cousin Michael in a home positioned across the street from Orange Elementary School.

On November 25, Greene inundated Knight with threatening text messages for five or six hours. He accused her of driving around with other men and being promiscuous. Specifically, Greene threatened to appear at her home and said that "he was going to hurt [her] and [her] daughter." Knight advised Greene she was not home and demanded that he not travel to her home. Greene told Knight she was "lucky if [he] dnt do smthn to [her]." He threatened, "Im goin to hurt u n everybody wit u." He continued, "U have a problem . . . On my bruvah . . . Im goin to hurt u . . . U fuckin whorre." When Knight demanded that Greene leave her alone, Greene responded, "Worry bout ur fsmily . . . Call the police . . . Im going ti hurt u." He reiterated, "Im runnin in ur crib . . . Im a gangsts . . . [and] I hope ur daughter in three." He further threatened to report to the police that she had narcotics in her vehicle and to have her fired from her job.

Knight testified that when she stopped answering Greene's text messages, he called and threatened to burn her house down. In text messages after the call, Knight attempted to entice Greene to make his threat in writing. Greene, however, denied threatening to burn Knight's home down and insisted that he had been home "the whole time."

While Greene inundated Knight with phone calls and text messages, he also messaged Shannon Boston, Knight's friend, at 2:30 a.m. on November 26. In the communications with Boston, Greene threatened that he was going to do something to Knight and that Boston had to choose between Knight and her uncle.

Eventually, Knight shut her phone off and went to sleep. In the early morning hours of November 26, Knight's mother woke to the smell of something burning. Knight and her mother searched the house and warned their sleeping family members about a potential fire. When Knight reached the first floor, she observed black smoke seeping into the home through the front door. She opened the door and observed the door mat on fire and four-inch flames "burning the door and the---the ceiling of the outside." Knight testified that "[a]s [she] was opening the door, [her] phone was ringing from [Greene's] Facetime." Knight answered but she and her mother "could not really understand him, [but] he was laughing." Knight did not see Greene anywhere nearby at that time.

Michael testified that he observed Knight open the door to flames. He retrieved his shoes and stomped out the flames. Michael noted that it took him 45 seconds to extinguish the fire. To ensure the fire was smothered, Michael filled a five-gallon bucket and dowsed the area with water two or three times. Michael then moved the burnt mat from the doorway. Before putting out the fire, Michael observed the mat, wooden doorframe, and insulation on the bottom of the building were burning. On cross-examination, Michael explained that the home's wood siding does not extend to the home's foundation. Thus, the insulation under the door was visible.

At 5:30 a.m. on November 26, Orange County police officer Corporal Michael Utz responded to a dispatch that a structure was on fire. Upon arrival, he noticed that there was a charred area of the building and there was smoke inside the residence and around the door. Fire and rescue arrived shortly thereafter and sprayed water around the door.

At 5:32 a.m., Assistant Chief of Orange County Fire and EMS, Craig Johnson, arrived at the scene to investigate the cause of the fire. In the walkway leading to the front door, Chief Johnson passed a partially burned mat. At the front door, he observed "that insulation underneath the sill of the door . . . [and] [b]oth sides of the molding on the door had been burned." Pictures of the scene depicted scorch marks on the molding on either side of the door, burnt foam under the door, and the outline on the concrete of where the mat had been. Chief Johnson rubbed his finger along the wooden door frame and felt rough damage to the molding. He then collected samples from the foam insulation and the mat for testing. Testing determined that the mat and the insulation were soaked in gasoline. Chief Johnson determined that the fire originated with application of gasoline on the mat and insulation and ignition of the gasoline. Chief Johnson noted that, had it not been extinguished, the fire would have "continued to grow and consume more and more of the building until the building was gone and . . . destroyed."

On cross-examination Chief Johnson admitted that he and the Commonwealth had discussed Michael's testimony a week before trial. During that conversation, Chief Johnson specifically asked Michael if he had seen the "mat, the insulation, [and] the wood molding" burning. Chief Johnson acknowledged that he asked Michael these questions only after reading the defense expert's report. When asked if, hypothetically, an uninterrupted gas fire on a petroleum mat would have burned to extinction, Chief Johnson acknowledged that it would. Chief Johnson also acknowledged that if a gas fire on a petroleum mat were disturbed by pouring water or stomping on it, the fire could move to the insulation. Finally, Chief Johnson admitted he was unaware if the foam insulation was flame-retardant.

Dayvon Greene (Dayvon), Greene's nephew, testified that he lived with his grandmother and Greene in November 2019. When Dayvon returned home at 2:30 a.m. on November 26, Greene was on the phone in his bedroom. Dayvon was unable to hear the content of the

- 4 -

conversation, but Greene sounded "aggressive." Later that day, Greene asked Dayvon and Jedaiah Brown to drive him to the jail. Greene explained that he heard he was in trouble and he "just want to turn himself in." The pair agreed. While traveling to the jail, Greene asked Dayvon "if there were cameras at [Orange] elementary school." Dayvon stated that he was "pretty sure they have cameras because all the vandalism that happens" there. Greene responded, "they got me."

Detective Clarence Johnson met with Greene when he arrived at the Central Virginia Regional Jail. Detective Johnson had responded to the Knights' home on November 26 to investigate the fire. Detective Johnson informed Greene that there was no warrant for his arrest and asked if Greene was willing to speak with him. Greene agreed. Greene asserted that Knight had fabricated the incident and that he attempted to end the relationship with Knight via text to pursue a relationship with his child's mother. During this conversation, Greene indicated to Detective Johnson that he had two phones. He used one for social media and the other for calling and texting.

On November 27, Detectives Evans Oakerson and Johnson executed a search of Greene's home. They recovered an iPhone from Greene's bedroom but were unable to locate his second phone. While detectives searched, Dayvon was on the phone with Brown. Brown indicated that she had Greene's LG phone in her vehicle. While speaking with Detective Johnson over Dayton's phone Brown acknowledged that she and Dayvon drove Greene to the jail the day before and Greene had left the phone in her vehicle. Brown agreed to give the detectives the phone if they would collect it from her place of employment. The detectives ultimately collected the phone from Brown and sent both of Greene's phones to the Virginia State Police to extract information from the devices.

While reviewing the extracted information from Greene's phones, Detective Johnson found a video taken at 12:50 p.m. on November 26. The video was dark but voices could be heard in the background discussing whether there were cameras at Orange Elementary School. Detective

Johnson showed the video to Dayvon, who identified Greene's voice. The video was played for the court.[2] During his investigation, Detective Johnson learned that Greene was at a Sheetz store with an unknown woman just after 1:00 a.m. on November 26.

On the second day of trial, after the Commonwealth rested its case-in-chief, Greene moved for a mistrial. Greene argued that the Commonwealth violated the discovery order when it failed to inform him that Michael's testimony had materially changed, *i.e.* that Michael now remembered that the insulation was burning before he attempted to stamp out the fire. He asserted that he could not properly impeach Michael as the witnesses who testified before him had been released. The trial court denied Greene's motion and noted that several witnesses had testified that the insulation was burning. Specifically, Knight had testified that the insulation was burning when she first observed the fire. Additionally, Chief Johnson testified that he observed and felt that the insulation under the door as well as the molding on both sides of the door were burnt.

Greene then called Jasmine Greene (Jasmine) as a defense witness. The Commonwealth objected to Jasmine's testimony because she had not been disclosed as a witness seven days before trial, as the discovery order required. The Commonwealth further argued that even if Greene had not anticipated calling Jasmine until after the first day of trial, he had ample time to inform the Commonwealth of his intention to call her before the second day of trial.[3]

Greene's counsel acknowledged that Jasmine was not disclosed as a witness before trial but argued she was necessary to rebut Michael's changed testimony that the insulation was burning. He asserted that if he had known the Commonwealth's evidence had changed, he likely would have gathered the new evidence and informed the Commonwealth about its existence before trial.

---

[2] The video is not part of the record because the Commonwealth never formally moved the video into evidence. Nor does the trial transcript include the video's content.

[3] The first day of trial was July 20, 2022. The second day of trial was July 23, 2022.

When the trial court asked Greene's counsel if "there [was] any [reason] why you did not inform the Commonwealth immediately" upon receiving the photograph, Greene's counsel stated that he had only received it the night before and that he "wasn't sure [Jasmine] was going to be here." The trial court reiterated, "But you knew that if she was here you would call her?" Greene's counsel affirmed the trial court's understanding. Noting that Greene's counsel had sufficient time to notify the Commonwealth about Jasmine's potential testimony, the court granted the Commonwealth's motion to exclude Jasmine as a witness.

Greene stated that Jasmine would have authenticated a picture that depicted Knight's front door and stoop as it appeared on the first day of Greene's trial. Greene's counsel claimed that the picture depicted a closer view of the bottom of the door and door trim with "speckle marks of black soot that [were] deposited on the steel door." He asserted that if the photograph were shown to the experts, they would have affirmed that water "splashed the soot or debris onto the door." Furthermore, he asserted that the picture proved that there was no insulation under the door.

Greene then called Dr. Craig Beyler. After being qualified as an expert in origin and cause of fire, Dr. Beyler testified that Chief Johnson's report was not an "origin and cause" report because it did not follow the standard format of such a report. Upon review of all the discovery information, Dr. Beyler concluded that the fire began on the mat but that the cause was indeterminate. In reaching this conclusion, Dr. Beyler considered the presence of soot deposits below the doorframe, but no burning, and the absence of blistering or charring on the painted surface and the wood at the base of the door. Dr. Beyler further explained that fire suppression efforts can cause destruction and that water is not a good extinguishing agent for gasoline because gasoline floats on water. He opined that when water was poured on the fire in this case, the burning gasoline followed the path of water runoff, such as through the crack in the front of the home.

Contending that the evidence was insufficient to prove arson, Greene asserted that the evidence proved that Knight's home accidentally burned. He asserted that but for the intervening act of pouring water on the fire, the structure would not have been damaged at all. He further argued that Michael's testimony that the structure was burning before he extinguished the fire was incredible. Greene claimed that Michael was coached through his pretrial conference with Chief Johnson and the Commonwealth. Greene maintained that the only other testimony that the insulation burned was from Chief Johnson, who arrived after the fire was extinguished.

After considering closing arguments from counsel, the trial court credited the Commonwealth's evidence and convicted Greene of both charges. The court convicted Greene of the charges and sentenced him to 40 years, with 35 years suspended. Greene appeals.

## ANALYSIS

### I. Exclusion of Photograph and Jasmine's Testimony

In his first assignment of error, Greene appears to make two intertwined, yet distinct arguments. First, the trial court violated his constitutional rights when it excluded Jasmine's testimony and the photograph. Second, he claimed it was prejudicial error to exclude Jasmine's testimony and the photograph. We will address each in turn below.

### A. Constitutional Claim

Greene asserts that the trial court violated his constitutional rights to present evidence on his behalf and impeach the Commonwealth's witnesses when the court refused to admit Jasmine's testimony and the photograph.[4]

Rule 5A:18 requires that an "objection [be] stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Pursuant to the rule, "a specific argument must be made to the trial court at the appropriate time,

---

[4] On brief, Greene does not specify which constitutional rights were violated.

or the allegation of error will not be considered on appeal." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). "[M]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review." *Hicks v. Commonwealth*, 71 Va. App. 255, 266 (2019) (second alteration in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 637 (2011)). *See Ray v. Commonwealth*, 74 Va. App. 291, 306-07 (2022).

Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). "Rule 5A:18 applies to bar even constitutional claims." *Id.* (quoting *Ohree*, 26 Va. App. at 308). "Specificity and timeliness undergird the contemporaneous-objection rule[ and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)); *Brown v. Commonwealth*, 279 Va. 210, 217 (2010). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Bethea*, 297 Va. at 743.

Here, Greene raises his constitutional challenge for the first time on appeal. At trial, the Commonwealth objected to Jasmine's testimony because the defense failed to give notice of her appearance as required by the discovery order. In responding to the Commonwealth's objection, Greene's counsel never argued that excluding Jasmine's testimony and the photograph violated his constitutional rights. "Although Rule 5A:18 contains exceptions for good cause or to meet the ends of justice, [Greene] does not argue these exceptions and we will not invoke them *sua sponte*." *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010). Accordingly, because

Greene failed to preserve his argument that exclusion of Jasmine's testimony and the photograph violated his constitutional rights, we do not address it.

## B. Prejudicial Error Claim

Greene further argues the trial court committed prejudicial error when it excluded Jasmine's testimony and a picture of Knight's front door. At trial, Greene did not make the rejected photograph a part of the record. Nor did he proffer the questions he would have asked Jasmine or the responses she would have given had she been permitted to testify.

"In Virginia, when 'testimony is rejected before it is delivered, an appellate court has no basis for adjudication unless the record reflects a proper proffer.'" *Ray v. Commonwealth*, 55 Va. App. 647, 649 (2010) (quoting *Whittaker v. Commonwealth*, 217 Va. 966, 968 (1977)). "When an appellant claims a trial court abused its discretion in excluding evidence, we cannot competently determine error—much less reversible error—without 'a proper showing of what that testimony would have been.'" *Id.* (quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006)). A proffer is necessary because it "allows us to examine both the 'admissibility of the proposed testimony'" as well as the prejudice its assertedly erroneous exclusion caused the proffering party. *Id.* at 650 (quoting *Tynes*, 49 Va. App. at 21).

"'[C]ounsel . . . must ensure [that such] proffers contain all of the information necessary' to achieve two purposes: to allow the trial court a fair opportunity 'to resolve the issue at trial' and 'to provide a sufficient record for . . . [appellate] review.'" *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015) (third and fourth alterations in original) (quoting *Albert v. Albert*, 38 Va. App. 284, 290 n.1 (2002)).

Here, Greene did not proffer what Jasmine's testimony would have been to authenticate the photograph and provide foundation for its admission. Nor did counsel explain how a photograph of the scene from two years after the event was relevant. Thus, we have no basis to

discern whether the photograph was admissible and whether any possible error in the exclusion of the photograph was harmless. Additionally, the excluded picture does not appear in the record.[5] Greene likewise failed to proffer the expected testimony expert witnesses would have provided based upon the excluded photograph. Greene merely repeated his theory of the case. Greene's failure to proffer the excluded evidence adequately precludes us from reviewing the trial court's decision. Consequently, we cannot consider the merits of his first assignment of error.

## II. Sufficiency of the Evidence

Greene asserts that the evidence was insufficient to prove he burned the structure. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

---

[5] Greene's counsel proffered a black and white photograph as well as a color photograph of the Knights' front door. The trial court noted that the photographs were proffered to the record for purposes of appeal but had been refused and that it would mark it later. This did not occur.

- 11 -

Greene asserts that the evidence shows that he only burned a doormat, not a dwelling. He argues that the fire on the mat would have extinguished itself had it been left alone. Because Michael poured water onto the mat, Greene claims, the fire spread to the home. Thus, he asserts, "he was not the agent responsible for any burning of the occupied dwelling."

"If any person maliciously . . . burns . . . in whole or in part . . . any dwelling house . . . [of] another . . . he shall be guilty of a felony." Code § 18.2-77. "The Commonwealth had the burden to prove beyond a reasonable doubt both that the fire was incendiary and that the accused was the criminal agent." *Marable v. Commonwealth*, 27 Va. App. 505, 510 (1998). "Although fires are presumed to be accidental, that presumption is rebuttable." *Id.*; *see also Knight v. Commonwealth*, 225 Va. 85, 89 (1983).

"Arson is a crime of stealth and [t]he proof is often necessarily circumstantial." *Hickson v. Commonwealth*, 258 Va. 383, 387 (1999) (alteration in original) (quotation marks omitted) (quoting *Cook v. Commonwealth*, 226 Va. 427, 432 (1983)). "Circumstantial evidence in a case of arson, as in every criminal case, can support a conviction if it sufficiently excludes every reasonable hypothesis of innocence." *Id.* The reasonable-hypothesis principle is "simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." *Taylor v. Commonwealth*, 61 Va. App. 13, 30 (2012) (quoting *Kelly*, 41 Va. App. at 258). The fact that a "defendant's theory of the case differs from . . . the Commonwealth['s theory] does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." *Clanton*, 53 Va. App. at 573 (quoting *Miles v. Commonwealth*, 205 Va. 462, 467 (1964)). To the contrary, by finding the defendant guilty, the fact finder has concluded "by a process of elimination that the evidence does not contain a reasonable theory of innocence." *Id.* (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). Critically, "[w]hether the

hypothesis of innocence is reasonable is . . . a 'question of fact' subject to deferential appellate review." *Id.* at 572-73 (citations omitted) (quoting *Haskins*, 44 Va. App. at 9).

In finding Greene guilty, the trial court accepted the Commonwealth's evidence, and rejected his theory of the case. "The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Additionally, "[t]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299-300 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)).

The Commonwealth's evidence proved that Greene poured gasoline onto the mat outside Knight's front door and set it on fire. The petroleum mat caused smoke to filter into the home; waking Knight's mother who smelled something burning. Knight and her mother searched the home, while arousing their sleeping family members. When Knight opened the front door, she and Michael observed a four-inch-high fire on the mat. Both saw that the door, the door frame, and the insulation under the door were burning. Michael quickly grabbed shoes and stomped the fire out. He then filled a five-gallon bucket and poured water over the mat to ensure the fire was extinguished before moving the mat away from the home.

The trial court discredited Greene's assertion that Michael's testimony was incredible. The court noted that there was no testimony that the water caused the fire to move from the mat to the

door. Instead, the court determined that the fire was extinguished when Michael poured the water from the inside of the home outward. Finally, the court found Chief Johnson to be more credible than Dr. Beyler. The court noted that Dr. Beyler did not observe the scene first-hand as Chief Johnson did. Thus, Chief Johnson was able to witness things that Dr. Beyler could not such as feel the burned areas around and under the door. Additionally, the trial court rejected Dr. Beyler's finding that the cause of the fire was indeterminate. The court specifically found that the fire began when someone poured gasoline on the mat and ignited it. The trial court, as the fact finder, was entitled to find Michael to be credible and give more weight to Chief Johnson's testimony than Dr. Beyler's. Accordingly, the Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Greene was guilty of arson.

CONCLUSION

Because Greene failed to preserve his argument for appellate review under Rule 5A:18 and failed to make an adequate proffer, we cannot consider whether the trial court erred in excluding evidence as Greene contends. We find that the evidence was sufficient to prove Greene committed arson. Accordingly, we affirm the trial court's judgment.

*Affirmed*.